SAMUEL M.W. CASPERSEN, as
Trustee for the Samuel M.W.
Caspersen Dynasty Trust u/a DTD
9/3/97,

        Plaintiff,

        v.

MARTIN ORING and SEARCHLIGHT
MINERALS CORP.

        Defendants.

Civ. No. 19-15819 (KM) (JBC)

**OPINION**

<u>**KEVIN MCNULTY, U.S.D.J.:**</u>

Plaintiff Samuel M.W. Caspersen invested more than a half million dollars in a speculative mining project overseen by defendants Martin Oring and Searchlight Minerals Corp. Caspersen claims that Oring and Searchlight fraudulently induced him to invest in the project and that his investment is now essentially worthless. In this diversity case, he seeks recovery under two common-law causes of action and New Jersey's blue-sky law.

Now before the Court is the motion of the defendants, Oring and Searchlight, to dismiss the complaint for failure to state a claim, pursuant to Fed. R. Civ. P. 12(b)(6). (DE 6).[1] For the following reasons, the motion is **DENIED**.

## I.    FACTS

Solely for purposes of this motion, the allegations in the complaint are assumed to be true and all inferences are drawn in favor of the plaintiff.

---

[1]     "DE __" refers to the docket entries in this case. "Compl. __" refers to the allegations in the complaint.

## A. The Parties

Plaintiff Samuel M.W. Caspersen is the trustee of the Samuel M.W. Caspersen Dynasty Trust and brings this action on its behalf. (Compl. ¶ 8). Defendant Martin Oring is the chairman, president, and CEO of defendant Searchlight Minerals Corp. (Compl. ¶¶ 9 & 10). Caspersen is a resident of New York; Oring is a resident of New Jersey; and Searchlight is a Nevada Corporation. (Compl. ¶¶ 8–10).

## B. Background

Searchlight is an exploratory-stage mining company whose primary project involves mineral recovery at a historical reclamation site in Clarkdale, Arizona. (DE 6-1 at 1). This dispute concerns Caspersen's investment in that project. Caspersen alleges that Oring and Searchlight made deliberately false and misleading representations and omissions regarding the deposits of gold at the Clarkdale site, which Searchlight owns outright. (DE 1-2 ¶ 1). Caspersen alleges that because of these representations, he invested more than a half million dollars into Searchlight's mining efforts and that this investment is now worthless. (Compl. ¶ 1). He now seeks to recover damages from Searchlight and from Oring, upon whose representations Caspersen relied. (Compl. ¶ 7).

In 2005 Searchlight acquired a fifty-percent interest in the Clarkdale project, and in 2007 it acquired the remaining fifty percent. (Compl. ¶ 17). In 2010, Searchlight appointed Oring as its chairman and CEO. (Compl. ¶ 27). Searchlight also hired Arrakis, Inc. to perform technical work and named James Murray, the owner of Arrakis, as its project manager. (Compl. ¶¶ 27 & 28).

At the Clarkdale site, the company has been working to transform an approximately twenty-million ton, forty-five-acre slag pile into a large-scale commercial metal reclamation operation. (DE 6-1 at 1). According to Searchlight, the project contains a significant volume of gold, and it may also contain residual copper and zinc. (Compl. ¶¶ 15–18).

To determine the mineral content of a slag pile like the one at Clarkdale, Searchlight tests for the "head grade." That is the term metallurgists use to refer to the measurement of the volume of a resource within a given deposit that may contain valuable minerals. (Compl. ¶¶ 19–21). The conventional method used to calculate the head grade of gold is a process known as fire assaying. (Compl. ¶¶ 19–21). An assay yielding 0.5 ounces per ton ("OPT") is considered commercially viable and very promising. (Compl. ¶¶ 19–21). According to Searchlight, traditional fire assay methods are ill-suited to accurately determine the amount of gold at Clarkdale. (Compl. ¶ 26).

### C. SGS Testing

In 2011, Searchlight engaged a metallurgy-consulting firm, SGS, to assess the Clarkdale slag in a way that Searchlight could use to solicit capital investors. (Compl. ¶ 29). In February 2011, SGS began testing samples of Clarkdale slag in its Chilean laboratories. (Compl. ¶ 30).

Seven months later, Searchlight issued a press release that described tests that were "independently performed by SGS" and which "confirm[ed]" earlier test results "yield[ing] up to 0.5 [OPT]." (Compl. ¶¶ 33–34). However, SGS had not independently performed these tests. (Compl. ¶ 35). Instead, large portions of the work had been performed by Arrakis, which Searchlight had also hired. (Compl. ¶¶ 35 & 43).

In early 2012, SGS conducted additional tests at its Australian facilities. (Compl. ¶ 36). On May 7, 2012, Searchlight announced "the results of tests conducted by an independent Australian metallurgical testing firm." (Compl. ¶ 38). The press release claimed that "[p]reviously, the Company repeatedly demonstrated the ability to successfully extract gold into solution in values approximating 0.5 ounces per ton," and it touted results from the "independent" Australian firm. (Compl. ¶ 39). The press release also noted the

involvement of a scientist at Arrakis named Kathy Wakeman, claiming that she had "over 35 years [of] experience." (Compl. 39).[2]

During its Australia testing, Searchlight used different methodologies, including the so-called "atomic absorption" method that Wakeman had developed. (Compl. ¶ 43). But Searchlight knew that Wakeman's methodology was improper; Arrakis consultant Michael Thomas described the process as "a bunch of bullshit." (Compl. ¶¶ 43 & 44).

SGS grew distrustful of Searchlight's scientific integrity and eventually prohibited Searchlight from using its name in connection with any publicity related to the findings. (Compl. ¶ 43). Accordingly, the May 7, 2012 press release did not refer to SGS by name, and Searchlight later referred to prior SGS tests as originating from "an independent engineering firm in Chile." (Compl. ¶ 43).

By 2013, Searchlight had internally discarded the results of the atomic absorption test, and it eventually stopped using the method entirely. (Compl. ¶ 45). However, Oring and Searchlight continued to publicly cite the data generated by the discredited atomic absorption methodology. (Compl. ¶ 45).

Emily Bray, an Arrakis geologist ,discussed with Oring her own test results, which typically revealed an OPT of 0.02 or less. (Compl. ¶ 46). The highest yield that Bray's tests revealed was an OPT of 0.17—just over one-third of the publicly disclosed value of 0.5. (Compl. ¶ 46). And even that 0.17 value was described by Bray as an outlier. (Compl. ¶ 46). According to Bray, Searchlight's public claims—that it consistently and repeatedly demonstrated results at the 0.5 OPT level—are false and misleading. (Compl. ¶¶ 48 & 49).

Searchlight engineer Douglas Aho explained that he never understood the source of the 0.5 OPT claim. (Compl. ¶ 50). The results of Aho's own tests showed very little gold—nowhere near 0.5 OPT. (Compl. ¶ 50). Aho theorized

---

[2]     The press release did not disclose that Wakeman's background was in testing water samples—not precious metals. (Compl. ¶ 40). Several seasoned metallurgists acknowledged that Wakeman was neither capable of nor competent to perform the work with which she had been tasked. (Compl. ¶ 40).

that Searchlight discarded low results and only issued reports with favorable numbers. (Compl. ¶ 50). He also claimed that the company made no progress at all with respect to gold extraction during his tenure at Searchlight. (Compl. ¶¶ 50 & 51).

Undeterred, Searchlight on March 10, 2015 issued a press release that claimed that testing "had consistently yielded 0.47 OPT (or greater)." (Compl. ¶ 47). The press release did not disclose that the numbers were the product of a scientific process that Searchlight itself had internally discredited—namely, the atomic absorption method. (Compl. ¶ 47).

### D. Caspersen's Investment in Searchlight

Throughout the spring of 2015, Oring solicited Caspersen for a private investment. (Compl. ¶ 80). During an April 3 phone call, Oring emphasized the positive gold measurements that SGS's tests in Chile and Australia had yielded. (Compl. ¶ 80). Oring told Caspersen that conventional testing was ineffective on Clarkdale slag but that the atomic absorption method allowed Searchlight to successfully extract a gold yield of 0.5 OPT. (Compl. ¶ 80). According to Oring, Clarkdale represented one of the largest gold discoveries in the world within the previous decade. (Compl. ¶¶ 80 & 81). Oring told Caspersen that Searchlight had in December 2014 discovered how to successfully extract the gold, that it was "perfecting the process," and that it was only two months away from its target date. (Compl. ¶¶ 88 & 89).

On April 22, 2015, Oring sent Caspersen a pitchbook. (Compl. ¶ 90). The book claimed that "[s]ignificant amounts of gold and other valuable metals were 'locked up' in the sulfide slag material." (Compl. ¶ 91). Consistent with Oring's other representations, the pitchbook also claimed that Searchlight's "major technical breakthrough" was a "game-changer" and that the "greatest metallurgical risks have been solved." (Compl. ¶¶ 90–92). The pitchbook repeated the claim that Searchlight had "verified prior reported gold grades between 0.4 to 0.6 ounces per ton (average)." (Compl. ¶ 93). It also claimed that

Searchlight had "reduced [its] burn rate to approximately $200,000–$250,000 per month (down from $500,000+)." (Compl. ¶¶ 97 & 125).

The OPT range presented in the pitchbook was not the product of a valid scientific methodology, and Searchlight had ignored unfavorable numbers while reporting only the favorable outliers. (Compl. ¶ 94). Indeed, Searchlight had already stopped using the atomic absorption method years before Oring and Searchlight presented the values derived from that process. (Compl. ¶ 94).

To help him evaluate the investment opportunity, Caspersen engaged Matthew Bender of Samuels Engineering ("SE"). (Compl. ¶ 98). Bender traveled to Clarkdale to inspect the slag pile and the related infrastructure. (Compl. ¶ 98). Bender also reviewed records that were made available to him, including documents relating to SGS's 2011 and 2012 testing. (Compl. ¶ 98). Furthermore, Murray represented to him that the SGS tests were evidence that Clarkdale contained substantial volumes of recoverable gold. (Compl. ¶ 98).

After receiving Searchlight's pitchbook, Caspersen posed several questions, to which Oring responded in writing on May 4, 2015. (Compl. ¶ 103). Oring claims that "Searchlight has repeatedly proven the gold is there" and that "[t]he current process to recover gold is repeatable and has been repeated." (Compl. ¶ 103).

Oring further claimed that:

- Testing had "successfully demonstrated the occurrence and recovery of gold at 0.5" OPT;

- Arrakis's testing in 2010 and 2011 "[w]as successful in extracting 0.5 opt gold into solution";

- SGS Chile "was successful in extracting 0.5 opt gold into solution";

- SGS Australia "was successful in extracting 0.2–0.6 opt gold into solution" in 2012; and

- Searchlight was "successful in verifying the 0.5 opt gold in the slag material" in testing during the 2013-2015 time period.

(Compl. ¶ 104). Oring did not tell Caspersen that Searchlight had stopped using the atomic absorption method that had generated the values Oring cited. (Compl. ¶ 108). Oring also did not disclose that SGS refused to allow Searchlight to use SGS's name in its publicity materials. (Compl. ¶¶ 105–08).

On May 11, 2015, Searchlight forwarded Caspersen even more materials, including press releases and further answers to his earlier questions. (Compl. ¶ 112). For instance, one press release that Searchlight attached claimed that its tests were "verified by standard fire assay analyses and confirmed previously determined slag gold grades of 0.4 to 0.6 opt." (Compl. ¶¶ 112–13).

On May 13, 2015, Caspersen, relying on Oring and Searchlight's representations, invested $525,000 in Searchlight. (Compl. ¶ 115). About a year later, Oring told Caspersen that Searchlight was recapitalizing and that Caspersen would risk massive dilution unless he invested an additional $50,000. (Compl. ¶ 116). Caspersen spoke on the phone with Oring and one of Searchlight's independent directors, who told him that additional investor money would pay for an independent assessment of the gold volume at Clarkdale. (Compl. ¶ 116). On May 11, 2016, Caspersen invested an additional $50,000 in the project. (Compl. ¶ 117).

### E. SE Testing

In the summer of 2015, one of Searchlight's largest investors demanded of Oring that, in exchange for a further investment, Searchlight engage a reputable consulting firm to independently assess the project's gold levels. (Compl. ¶ 53). In November 2015, Searchlight hired consulting firm Samuel Engineering ("SE") to independently test the slag samples. (Compl. ¶ 54).

SE chemist Meg Dietrich Levier began the assessment by reviewing Searchlight's internal documents. (Compl. ¶ 56). During the assessment, Levier obtained underlying data that SE later determined had been hidden from SE by Searchlight and Murray. (Compl. ¶ 56). The data showed that SGS had been critical of Arrakis's methodology. Levier, an experienced analytical chemist, saw from the data that the atomic absorption process was not sufficiently sensitive

and could not accurately measure tiny gold volumes in a mixture predominated by iron. (Compl. ¶ 58). In December 2015, Levier questioned Murray about this, and he responded that Searchlight no longer used the atomic absorption method. (Compl. ¶ 58).

Throughout 2016, SE continued rigorous testing to measure the project's head grade gold. (Compl. ¶ 60). Initial results indicated a very low gold volume. (Compl. ¶ 60). Searchlight did not receive the results well; Murray waved off the data, saying it stemmed from a bad sample. (Compl. ¶ 60). SE noted, however, that it had obtained the sample from Arrakis, which had claimed that earlier tests of that sample had shown substantial head grade volumes. (Compl. ¶ 60).

SE issued a second report in September 2016. (Compl. ¶ 62). The report again noted very low gold volumes. (Compl. ¶ 62). Over the next few months, SE collected several more tons of slag from Clarkdale and sent the samples to vendors for processing. (Compl. ¶ 64). The results indicated that the verified gold volume was only 0.003 OPT. (Compl. ¶ 65). On February 10, 2017, SE emailed Oring a report titled "Searchlight Process Verification Final Report." (Compl. ¶ 66).

### F. The Fallout from the SE Report

In February 2017, after he received the report, Oring called Matthew Bender at SE, displeased that Bender had not first discussed with him the findings of the report. (Compl. ¶ 67). On March 7, 2017, Oring demanded that Bender reclassify the final report as a draft. (Compl. ¶ 68). Bender acquiesced and sent him an email to that effect. (Compl. ¶ 68).

On March 15, 2017, SE representatives met with Searchlight's board members to discuss the report. (Compl. ¶ 69). Oring participated by phone. (Compl. ¶ 69). During the meeting, SE described how Arrakis's testing methodology was entirely invalid and deviated from standard industry practices. (Compl. ¶ 69). Oring expressed frustration that SE refused to follow the direction of a paying client. (Compl. ¶ 70).

On March 21, 2017, Oring called Bender and asked him to change the results of the SE report. (Compl. ¶ 71). Bender had asked his colleague Brian Olson to listen in to the conversation, and according to Bender and Olson, Oring offered Bender a bribe to change the results of the report. (Compl. ¶ 71). Two days later, Oring called Bender and again urged him to change the results of SE's work, remarking that the SE report would "destroy" him and Searchlight. (Compl. ¶ 73).

Searchlight had planned to file its annual SEC report around March 24, 2017. (Compl. ¶ 74). Oring had approved a draft that discussed Arrakis's calculations, which allegedly resulted in an "average slag head grade of 0.46 opt gold" and claimed stated that "[t]he tests were all verified by standard fire assay analyses and confirmed previously determined slag gold grades of 0.4 to 0.6 opt." (Compl. ¶ 74). The report did not disclose SE's findings that had discredited Arrakis's methods and demonstrated that the reported numbers were incorrect. (Compl. ¶ 74). Searchlight never filed the report. (Compl. ¶ 74).

On April 7, 2017 Oring and Bender spoke yet again, and Oring ordered Bender not to send a final report out of concern over (1) a potential new investor and (2) Searchlight's board of directors, to both of whom the report would need to be disclosed. (Compl. ¶ 75). On April 9, 2017, Bender sent a "final draft report" to Oring and Murray. (Compl. ¶ 77). That spring, two Searchlight board members resigned following criticisms of Searchlight's management and ethical practices. (Compl. ¶ 78).

### G. Oring's Continued Solicitation

On February 14, 2018, Searchlight issued a press release in which Oring claimed that Searchlight's "previously tested method of recovering gold at .45 ounces per ton utilizing an autoclave . . . remains valid." (Compl. ¶ 119). Seeking a further investment from him, Oring emailed Caspersen the press release. (Compl. ¶ 120). Again, Oring did not disclose the results of SE's analysis, and he did not tell Caspersen that Arrakis's methodology had been thoroughly discredited. (Compl. ¶¶ 121 & 122).

Caspersen was skeptical of Oring's claims. By this point, Searchlight's publicly traded stock had decreased in value by nearly 96% from when Caspersen first invested in Searchlight. (Compl. ¶ 122). Caspersen did, however, commit additional funds for investment.

Caspersen's securities in Searchlight are illiquid and restricted and thus cannot easily be sold. (Compl. ¶ 118). Moreover, Searchlight's equity is practically nonexistent. The market value of the assets in which Oring and Searchlight induced Caspersen to invest is practically zero. (Compl. ¶ 118).

### H. Procedural History

On June 19, 2019, Caspersen, as trustee for the Samuel M. W. Caspersen Dynasty Trust, sued in New Jersey Superior Court, Bergen County. (DE 1-2). Defendants Oring and Searchlight, he alleged, committed fraud and negligent representation and made false and misleading statements in violation of the New Jersey Uniform Securities Act ("NJUSA"), N.J. Stat. Ann. § 49:3-47 *et seq.*

On July 25, 2019, Oring and Searchlight removed the case to federal court, noting that this Court has diversity jurisdiction under 28 USC § 1332 because the parties are citizens of different states and the matter in controversy exceeds $75,000. (DE 1). On August 15, Oring and Searchlight filed the Rule 12(b)(6) motion to dismiss the complaint that is the subject of this Opinion. (DE 6).

### II. DISCUSSION AND ANALYSIS

Caspersen accuses Defendants of committing (1) fraud and (2) negligent misrepresentation and of (3) violating the NJUSA. Those three claims have overlapping elements, and the parties largely agree as to the elements of each:

- The elements of fraud are: "false representation, scienter, materiality, expectation of reliance, justifiable reliance, and damage." *CreditSights v. Ciasullo*, 2007 U.S. Dist. LEXIS 25850

at *35 (S.D.N.Y. Mar. 26, 2007); *see also Butwinick v. Hepner*, 2014 Nev. Unpub. LEXIS 1227 at *2 (Nev. July 30, 2014).[3]

- "Negligent misrepresentation requires showing 'an incorrect statement, negligently made and justifiably relied on, which results in economic loss.'" *Lord Abbett Mun. v. Citigroup Global Mkts.*, 2017 U.S. Dist. LEXIS 128400 at *23 (D.N.J. Aug. 4, 2017).

- The NJUSA creates a cause of action against one who "[o]ffers, sells or purchases a security by means of any untrue statement of material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading (the buyer not knowing of the untruth or omission)[.]" N.J.[Stat. Ann.] § 49:3-71(a)(2). A claimant must show that the defendant "knew of the untruth or omission and intended to deceive the buyer" and that the buyer suffered a loss. *Id.* § 49:3-71(b)(1)–(2).

(DE 16 at 16).

Oring and Searchlight move to dismiss the complaint on several grounds. They argue that the complaint is pled with insufficient particularly, does not allege a plausible claim, and is barred by the "bespeaks caution" doctrine. (DE 6-1 at 11–24). They also argue that Caspersen's common-law claims are time-barred and that the NJUSA claim cannot be prosecuted because none of the tortious conduct occurred in New Jersey. (DE 6-1 at 24–30).

### A. Standard of Review

Rule 12(b)(6) provides for the dismissal of a complaint, in whole or in part, if it fails to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6). The defendant, as the moving party, bears the burden of showing that no claim has been stated. *Animal Sci. Prods., Inc. v. China*

---

[3]     The elements of a fraud claim are the same in New Jersey: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." *Suarez v. E. Int'l Coll.*, 428 N.J. Super. 10, 28 (App. Div. 2012) (quoting *German v. Weichert Co. Realtors*, 148 N.J. 582, 610 (1997)).

*Minmetals Corp.*, 654 F.3d 462, 469 n.9 (3d Cir. 2011). For the purposes of a motion to dismiss, the facts alleged in the complaint are accepted as true and all reasonable inferences are drawn in favor of the plaintiff. *N.J. Carpenters & the Trs. Thereof v. Tishman Const. Corp. of N.J.*, 760 F.3d 297, 302 (3d Cir. 2014).

Federal Rule of Civil Procedure 8(a) does not require that a complaint contain detailed factual allegations. Nevertheless, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, the complaint's factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, so that a claim is "plausible on its face." *Id.* at 570; *see also W. Run Student Hous. Assocs., LLC v. Huntington Nat. Bank*, 712 F.3d 165, 169 (3d Cir. 2013). That facial-plausibility standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). While "[t]he plausibility standard is not akin to a 'probability requirement' . . . it asks for more than a sheer possibility." *Iqbal*, 556 U.S. at 678.

The Court in considering a Rule 12(b)(6) motion is confined to the allegations of the complaint, with narrow exceptions:

> Although phrased in relatively strict terms, we have declined to interpret this rule narrowly. In deciding motions under Rule 12(b)(6), courts may consider "document[s] integral to or explicitly relied upon in the complaint," *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (emphasis in original), or any "undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document," *Pension Ben. Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

*In re Asbestos Prods. Liab. Litig. (No. VI)*, 822 F.3d 125, 134 n.7 (3d Cir. 2016);*see also Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) ("However,

an exception to the general rule is that a 'document integral to or explicitly relied upon in the complaint' may be considered 'without converting the motion to dismiss into one for summary judgment.'") (quoting *In re Burlington Coat Factory*, 114 F.3d at 1426); *Pension Ben. Guar. Corp., Inc.*, 998 F.2d at 1196.

Federal Rule of Civil Procedure 9(b) imposes a heightened pleading requirement for allegations of fraud, over and above that required by Rule 8(a). *Hughes v. Panasonic Consumer Elecs. Co.*, No. 10-846, 2011 U.S. Dist. LEXIS 79504 at *29, 2011 WL 2976839 (D.N.J. July 21, 2011). Rule 9(b) requires that "in all averments of fraud or mistake, the circumstances constituting the fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). "Malice, intent, knowledge, and other conditions of a person's mind," however, "may be alleged generally." *Id.* That heightened pleading standard requires the plaintiff to "state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the precise misconduct with which it is charged." *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007) (internal quotation and citation omitted).

In general, "[t]o satisfy this heightened standard, the plaintiff must plead or allege the date, time, and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." *Id.* "Plaintiff must also allege who made the misrepresentation to whom and the general content of the misrepresentation." *Lum v. Bank of Am.*, 361 F.3d 217, 224 (3d Cir. 2004) (internal citation omitted); *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 276–77 (3d Cir. 2006) ("Rule 9(b) requires, at a minimum, that plaintiffs support their allegations of fraud with all of the essential factual background that would accompany the first paragraph of any newspaper story—that is, the who, what, when, where and how of the events at issue.") (internal quotation and citation omitted)). The plaintiff

> need not, however, plead the "date, place or time" of the fraud, so long as they use an "alternative means of injecting precision and some measure of substantiation into their allegations of fraud." The purpose of Rule 9(b) is to provide notice of the "precise misconduct" with which defendants are charged and to prevent

false or unsubstantiated charges. Courts should, however, apply the rule with some flexibility and should not require plaintiffs to plead issues that may have been concealed by the defendants.

*Rolo v. City Investing Co. Liquidating Trust*, 155 F.3d 644, 658 (3d Cir. 1998) (quoting *Seville Indus. Machinery v. Southmost Machinery*, 742 F.2d 786, 791 (3d Cir. 1984)) (citing *Christidis v. First Pa. Mortg. Trust*, 717 F.2d 96, 99 (3d Cir. 1983)).

In addition, the Third Circuit has stated that these pleading requirements may be applied less strictly in the context of corporate fraud:

Courts must be sensitive to the fact that application of Rule 9(b) prior to discovery "may permit sophisticated defrauders to successfully conceal the details of their fraud." *Christidis*[ *v. First Pa. Mortg. Trust*], 717 F.2d [96,] 99–100 [3d Cir. 1983]. Particularly in cases of corporate fraud, plaintiffs cannot be expected to have personal knowledge of the details of corporate internal affairs. *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1439 (9th Cir. 1987); C. Wright & A. Miller, § 1298 at 416. Thus, courts have relaxed the rule when factual information is peculiarly within the defendant's knowledge or control.

*Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 645 (3d Cir. 1989); *DiMare v. MetLife Ins. Co.*, 369 Fed. App'x 324, 330 (3d Cir. 2010).

## B. Choice of Law

"[I]n a diversity action, a district court must apply the choice of law rules of the forum state to determine what law will govern the substantive issues of a case." *Warriner v. Stanton*, 475 F.3d 497, 499–500 (3d Cir. 2007) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). New Jersey uses the most-significant-relationship test, which consists of two prongs. *Maniscalco v. Brother Int'l Corp. (USA)*, 793 F. Supp. 2d 696, 704 (D.N.J. 2011), *aff'd sub nom. Maniscalco v. Brother Int'l (USA) Corp.*, 709 F.3d 202 (3d Cir. 2013). First, the court must determine whether a conflict actually exists between the potentially applicable laws. *P.V. v. Camp Jaycee*, 197 N.J. 132, 143 (2008) ("Procedurally, the first step is to determine whether an actual conflict exists. That is done by examining the substance of the potentially applicable laws to

determine whether there is a distinction between them.") (internal quotations omitted).

"[I]f no conflict exists, the law of the forum state applies." *Snyder v. Farnam Cos., Inc.*, 792 F. Supp. 2d 712, 717 (D.N.J. 2011) (quoting *P.V.*, 197 N.J. at 143). If the difference between the substantive laws presents a nonexistent or "false conflict," wherein "the laws of the . . . jurisdictions would produce the same result on the particular issue presented," New Jersey forum law will govern. *Williams v. Stone*, 109 F.3d 890, 893 (3d Cir. 1997). If a conflict exists, the court then moves to the second prong: it must determine "which state has the 'most significant relationship' to the claim at issue by weighing the factors" in the applicable section of the Restatement (Second) of Conflict of Laws. *P.V.*, 197 N.J. at 143.

As discussed in Section II., *supra*, the elements of fraud and negligent misrepresentation are the same under Nevada, New Jersey, and New York law. The laws *do* differ with respect to their statutes of limitation. For the reasons discussed in Section II.C., *infra*, it does not appear from the face of the complaint that the distinction has any practical effect on the timeliness of the action, and for the present, at least, the conflict appears to be a false one. Accordingly, I will apply New Jersey law to the common-law causes of action.

### C. Statutes of Limitation

The parties disagree which states' statutes of limitation should govern this dispute: Nevada, New Jersey, or New York. The parties agree that under New Jersey law, the action is timely (DE 6-1 at 27; DE 16 at 11–12), because New Jersey requires that a plaintiff file his or her claim within a six-year window after the tort occurred. *See* N.J. Stat. Ann. § 2A:14-1. In fraud or negligent-misrepresentation lawsuits, New York imposes the same six-year requirement, but it provides for an additional two-year period if the fraud is not

reasonably discovered within the original six-year period.[4] *See* N.Y. C.P.L.R. § 213(8); *Calcutti v. SBU, Inc.*, 224 F. Supp. 2d 691, 701–02 (S.D.N.Y. 2002).

Nevada requires plaintiffs to file claims for fraud or mistake within three years, but the statute also provides that such a claim does not accrue until "the discovery by the aggrieved party of the facts constituting the fraud or mistake."[5] Nev. Rev. Stat. § 11.190(3)(d).

Caspersen alleges that he discovered the fraud in February 2018. (Compl. ¶¶ 119–25). By his reckoning, the filing of this action in June 2019 therefore fell well inside the three-year period allowed by the Nevada discovery rule. (DE 1-2). Defendants question the premise of Caspersen's argument, *i.e.*, that he discovered the fraud in February 2018. They say that, based on Oring's May 2015 representation that the company was two months from commercial viability, Caspersen should have learned he had a cause of action when, two months later, the project had not taken off. (DE 6-1 at 29). But that claim stretches credulity, because a year later, Caspersen invested an additional $50,000 in Searchlight. It does not seem likely that Caspersen recognized that he had a fraud claim in July 2015, made a further investment in May 2016, and rested on his rights until July 2019.

The statute of limitations defense is an affirmative defense. It generally presents a jury question, and may be invoked on a motion to dismiss only if its applicability is apparent from the face of the complaint. *See Wisniewski v. Fisher*, 857 F.3d 152, 157 (3d Cir. 2017); *Fried v. JP Morgan Chase & Co.*, 850 F.3d 590, 604 (3d Cir. 2017). That cannot be said here; the allegations of the

---

[4]     Defendants, however, suggest that New York law is completely inapplicable to this dispute. (DE 17 at 10–11). Indeed, Caspersen has not identified why New York law should apply. (DE 16 at 11–14). For the moment, however, that issue is immaterial.

[5]     Defendants characterize this as a *two*-year statute of limitations and suggest that "Caspersen asks the Court to accept this date [of his discovery of the fraud] at face value." (DE 17 at 11). Notwithstanding the fact that the statute—which Defendants themselves cite—provides for a *three*-year limit, accepting at face value the allegations within the complaint is precisely what a court is required to do at the motion-to-dismiss stage.

complaint are consistent with Caspersen's theory, and the distinction between these states' statutes of limitations may present nothing more than a false conflict. Discovery may yield a basis for assertion of the statute of limitations on summary judgment, but for now it is sufficient that Caspersen plausibly alleges that he did not discover the fraud until February 2018. Because this action was filed nineteen months after his discovery of the alleged fraud, it satisfies the limitations requirements imposed by Nevada, New Jersey, and New York law. For purposes of this motion to dismiss, the action is timely.

### D. Sufficiency of the Pleadings

Caspersen accuses Defendants of committing (1) fraud and (2) negligent misrepresentation, and (3) of violating the NJUSA. Those three claims have overlapping elements, and the parties largely agree on what they are:

- The elements of fraud are: "false representation, scienter, materiality, expectation of reliance, justifiable reliance, and damage." *CreditSights v. Ciasullo*, 2007 U.S. Dist. LEXIS 25850 at *35 (S.D.N.Y. Mar. 26, 2007); *see also Butwinick v. Hepner*, 2014 Nev. Unpub. LEXIS 1227 at *2 (Nev. July 30, 2014).[6]

- "Negligent misrepresentation requires showing 'an incorrect statement, negligently made and justifiably relied on, which results in economic loss.'" *Lord Abbett Mun. v. Citigroup Global Mkts.*, 2017 U.S. Dist. LEXIS 128400 at *23 (D.N.J. Aug. 4, 2017).

- The NJUSA creates a cause of action against one who "[o]ffers, sells or purchases a security by means of any untrue statement of material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading (the buyer not knowing of the untruth or omission)[.]" N.J.[Stat. Ann.] § 49:3-71(a)(2). A claimant must show that the defendant

---

[6]     The elements of a fraud claim in New Jersey are the same: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." *Suarez v. E. Int'l Coll.*, 428 N.J. Super. 10, 28 (App. Div. 2012) (quoting *German v. Weichert Co. Realtors*, 148 N.J. 582, 610 (1997)).

"knew of the untruth or omission and intended to deceive the
buyer" and that the buyer suffered a loss. *Id.* § 49:3-71(b)(1)–(2).

(DE 16 at 16).

### 1. Misrepresentations of Fact

Defendants attempt to cast this lawsuit as a case of "fraud by hindsight."
(DE 6-1 at 16–18). It is true that "[s]tatements as to future or contingent
events, to expectations or probabilities, or as to what will or will not be done in
the future, do not constitute misrepresentations, even though they may turn
out to be wrong." *Alexander v. CIGNA Corp.*, 991 F.Supp. 427, 435 (D.N.J.
1998). However, "[a]n opinion or projection, like any other representation, will
be untrue if it has no valid basis." *Eisenberg v. Gagnon*, 766 F.2d 770, 776 (3d
Cir. 1985); *Kline v. First Western Gov't Servs., Inc.*, 24 F.3d 480, 486 (3d Cir.
1994).

Caspersen alleges that the following statements made by Oring and
Searchlight were false, not merely in hindsight, but at the time they were made:

- On September 6, 2011, a press release quoted Oring describing
  test results "independently performed by SGS" that showed 0.5
  OPT of gold. (Compl. ¶¶ 33–35).

- On August 19, 2014 Searchlight issued a press release in which
  it claimed that its "test results have consistently leached
  approximately 0.5 ounces per ton [] of gold into solution."
  (Compl. ¶ 110).

- On March 10, 2015, Searchlight claimed that its test had
  "consistently yielded .47 OPT (or greater)." (Compl. ¶ 47).

- On April 3, 2015, Oring told Caspersen that SGS had "cracked
  the shell" by successfully extracting a gold yield of 0.5 OPT.
  (Compl. ¶¶ 80–81).

- On April 22, 2015, Oring sent Caspersen a pitchbook that
  claimed that the "greatest metallurgical risks have been solved"
  and that the slag pile contained "approximately 0.4-0.5 ounces
  per ton" of gold. (Compl. ¶ ¶ 90–93).

- On May 4, 2015, Searchlight represented to Caspersen that that
  SGS Chile "was successful in extracting 0.5 opt gold into

solution" in 2011; that SGS Australia "was successful in extracting 0.2-0.6 opt gold into solution" in 2012; and that Searchlight had successfully "verif[ied] the 0.5 opt gold in the slag material" during testing in 2013–2015. (Compl. ¶ 104).

- The pitchbook also claimed that Searchlight had reduced its monthly burn rate to $200,000–$250,000 (from more than $500,000). (Compl. ¶ 97 & 125).

These are not mere allegations of overly optimistic predictions. These are allegations that Oring and Searchlight made affirmative statements of present and historical fact, which were false when made. Far from attempting to hold Defendants accountable for the failure of the Clarkdale project to prove fruitful, Caspersen has cited numerous press releases, publications, and first-person communications in which Oring and Searchlight made representations that were untrue at the time. (See, e.g., Compl. ¶¶ 33–35, 47, 80–81, 90–93, 97, 104, 110 & 125).

Caspersen has also made numerous allegations that the defendants had reason to know, at the time, that the statements were false. Allegedly, Searchlight had in 2013 abandoned the atomic absorption method, which produced the data used to induce him to invest; that Oring and Searchlight knew SGS had not independently tested the slag samples; and that SGS had disclaimed the numbers that Searchlight continued to tout publicly. (See, e.g., Compl. ¶ 35 & 45). At the motion-to-dismiss stage, a plaintiff must only allege that statements were untrue when made, and Caspersen's complaint easily satisfies that standard.

### 2. Scienter[7]

To show scienter, a plaintiff must plead allegations showing that the defendant was, at least, reckless: "This scienter standard requires plaintiffs to allege facts giving rise to a 'strong inference' of 'either reckless or conscious behavior." *Institutional Inv'rs Grp. v. Avaya Inc.*, 564 F.3d 242, 267–68 (3d Cir.

---

[7]     A claim for negligent misrepresentation does not require scienter as an element of the cause of action. *Kaufman v. I-Stat Corp.*, 165 N.J. 94, 110 (2000)

2009) (footnote omitted). Recklessness in this context is an "extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.* at 267 n.42 (quoting *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 535 (3d Cir. 1999)). While the factual particulars pled must give rise to "a strong inference" of scienter, the inference "need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or even the most plausible of competing inferences." *Id.* at 267 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 326 (2007)). "The pertinent question is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* (quoting *Tellabs*, 551 U.S. at 323.)

Rule 9(b) expressly provides that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Pleading "circumstantial grounds for such knowledge" is sufficient to meet the Rule 9(b) standard. *See Peruto v. TimberTech*, 2015 U.S. Dist. LEXIS 165982 at *11 (D.N.J. Dec. 10, 2015).

Here, Caspersen makes several allegations that he claims demonstrate that Oring knew that his statements were false and misleading:

- Searchlight's former treasurer Carl Ager claimed that Oring knew of the testing flaws because head grade was discussed at board meetings that Oring would have attended. (Compl. ¶ 85).

- Emily Bray told Oring that her tests typically yielded fewer than 0.02 OPT of gold. (Compl. ¶ 46).

- Bray was surprised that Oring touted numbers that were inconsistently achieved, and she thought it was misleading for him to do so. (Compl. ¶¶ 48–49).

- Ager claimed that Oring was desperate for investors and was willing to lie to achieve that goals—specifically by representing that Searchlight's monthly burn rate was only $200,000.

(DE 16 at 22). Collectively, these allegations support the theory that Oring and Searchlight contemporaneously knew that they were misleading Caspersen. If

true, these facts would show an "extreme departure from the standards of ordinary care." *See Avaya Inc.*, 564 F.3d at 267 n.42. These, as well as those cited in the section immediately preceding, are sufficient allegations of scienter.

### 3. Reliance[8]

A plaintiff alleging deceit must establish that that he or she relied on a defendant's misrepresentation and that those misrepresentations were a proximate cause of the damage.[9] *Kaufman v. I-Stat Corp.*, 165 N.J. 94, 109 (2000). The approach to "reasonable reliance" under New Jersey law is similar to that under federal securities laws. *See Braunstein v. Benjamin Berman, Inc.*, No. 89-5344, 1990 WL 192547 (D.N.J. Sept. 12, 1990).

Caspersen's complaint can be fairly read to allege that he relied upon the statements made by Oring and Searchlight. Caspersen has alleged that it was not apparent to him that Defendants' statements were false at the time they were made. (Compl. ¶ 127). He has also alleged that they had superior knowledge because they alone knew the nondisclosed facts that rendered the investment valueless. (Compl. ¶ 133). Accordingly, Caspersen has adequately pled that he relied—to his detriment—on the misstatements of Oring and Searchlight in making his investment.

In performing due diligence, Caspersen was required only to have acted reasonably; reasonableness is a factual issue, to be determined on a case-by-case basis and cannot easily serve as the foundation of a motion to dismiss. *Angrisani v. Capital Access*, 175 F. App'x 554, 557 (3d Cir. 2006) (issues of reliance and reasonableness "going as they do to subjective states of mind and . . . objective standards of reasonableness, are preeminently factual issues for the trier of fact"). The Third Circuit, moreover, has stated that

---

[8]     The element of reliance is the same for fraud and negligent misrepresentation, but it is not an element of an NJUSA claim. *Kaufman v. I-Stat Corp.*, 165 N.J. 94, 109, 112 (2000).

[9]     Caspersen has adequately pled damages, the final element of a fraud and negligent misrepresentation claim. (Compl. ¶¶ 131 & 137).

> a sophisticated investor is not barred by reliance upon the honesty of those with whom he deals in the absence of knowledge that the trust is misplaced. Integrity is still the mainstay of commerce and makes it possible for an almost limitless number of transactions to take place without resort to the courts.

*Straub v. Vaisman & Co., Inc.*, 540 F.2d 591, 598 (3d Cir. 1976).

> Since the failure to meet that standard is in the nature of an affirmative defense, the burden of proof rests upon the defendant. Such matters as fiduciary relationship, opportunity to detect the fraud, sophistication of the plaintiff, the existence of long standing business or personal relationships, and access to the relevant information are all worthy of consideration.

*Id.* In other words, whether Caspersen's due diligence was appropriate is fact-dependent and ill-suited to resolution on a motion to dismiss.

### 4. The New Jersey Uniform Securities Act

The NJUSA creates a cause of action against one who "[o]ffers, sells or purchases a security by means of any untrue statement of material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading (the buyer not knowing of the untruth or omission)." N.J. Stat. Ann. § 49:3-71(a)(2). A claimant must show that the defendant "knew of the untruth or omission and intended to deceive the buyer" and that the buyer suffered a loss. *Id.* § 49:3-71(b)(1)–(2).

Caspersen alleges that Oring resides in New Jersey and that "certain of the false and misleading statements described herein, along with offers to purchase securities, emanated from New Jersey." (Compl. ¶ 9 & 13). Defendants argue that the NJUSA is inapplicable because "[n]one of the misrepresentations that Caspersen alleges were made in New Jersey." (DE 6-1 at 27).

Under *Iqbal* and *Twombly*, at the dismissal stage, for a claim to be facially plausible, it must allege facts that raise the likelihood of relief merely above a speculative level. Caspersen's allegation that Oring lives in and

disseminated false and misleading information from New Jersey is sufficient to render the claim's plausibility more than a mere speculation.

Besides, the NJUSA was designed to "prevent [New Jersey] from being used as a base of operations for crooks marauding outside the state." *Stevens v. Wrigley Pharmaceutical*, 9 N.J. Misc. 385, 386 (N.J. Ch. Div. 1931); *see also A.S. Goldmen & Co. v. N.J. Bureau of Sec.*, 163 F.3d 780, 788 (3d Cir. 1999) ("[P]reventing New Jersey companies from offering suspect securities to out-of-state buyers helps preserve the reputation of New Jersey's legitimate securities issuers. States that have failed to monitor out-of-state sales by in-state broker-dealers have suffered in the past, as their legitimate broker-dealers suffered from association with suspect firms offering questionable securities."). Accordingly, Caspersen has pled sufficient facts to survive a motion to dismiss under Rule 12(b)(6).

### E. The Bespeaks Caution Doctrine

Defendants argue that Caspersen's claims are barred by the "bespeaks caution" doctrine. (DE 6-1 at 24–26). This doctrine of course does not permit a defendant to argue that the plaintiff should have know better than to trust him; it does, however, insulate from liability a defendant who adequately warns a plaintiff of an investment's inherent risks. Here, Oring and Searchlight argue that the materials they furnished to Caspersen repeatedly warned of the investment's inherent risk. (DE 6-1 at 24). The bespeaks caution doctrine "provides a mechanism by which a court can rule as a matter of law . . . that defendants' forward-looking representations contained enough cautionary language or risk disclosure to protect the defendant against claims of securities fraud." *Lilley v. Charren*, 17 F. App'x 603, 607 (9th Cir. 2001) (quoting *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1413 (9th Cir. 1994)).

Under the doctrine, forward-looking statements that are "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement," cannot provide the basis for a fraud claim. *Nat'l Junior Baseball*

*League v. Pharmanet Dev. Grp. Inc.*, 720 F. Supp. 2d 517, 530 (D.N.J. 2010) (quoting *EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 872-73 (3d Cir. 2000) (quoting 15 U.S.C. § 78u–5(c)(1)(A)(i)). The "bespeaks caution" doctrine applies to common law fraud claims, just as it does in securities law, because it affects "the question of defendants' intent to defraud and plaintiffs' reasonable reliance." *Gurfein v. Sovereign Grp.*, 826 F. Supp. 890, 904 (E.D. Pa. 1993).

The bespeaks caution doctrine does not apply, however, where, as here, a plaintiff alleges that a defendant made intentionally misleading statements. *See Nat'l Junior Baseball League*, 720 F. Supp. 2d at 534 n.15 ("[T]he bespeaks caution doctrine does not protect forward-looking statements made with actual knowledge of their falsity at the time they are made."). "[O]pinions, predictions and other forward-looking statements are not *per se* inactionable under the securities laws. Rather, such statements of 'soft information' may be actionable misrepresentations if the speaker does not genuinely and reasonably believe them." *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 368 (3d Cir. 1993)

Caspersen makes numerous allegations that Oring and Searchlight knowingly made misrepresentations of present and historical fact, see SectionII.D.1, *supra*. The bespeaks caution doctrine, even if it turns out to present an issue for the jury, does not negate the validity of these allegations *qua* allegations. Dismissal will not be granted on "bespeaks caution" grounds.

## III.   CONCLUSION

For the reasons set forth above, the motion to dismiss is **DENIED**.

A separate order will issue.

Dated: February 28, 2020

Hon. **Kevin McNulty**
**United States District Judge**